## Burley Tobacco Growers' Co-operative Association v. Tipton et al.

(Decided November 27, 1928.)

298

ROBERT H. HAYS, BROWNING & REED and AARON SAPIRO for appellant Burley Tobacco Growers' Co-operative Association.

DANIEL DURBIN, J. M. FINCH, BARRICKMAN & KALTENBACHER and C. O. HEMPPLING for appellants Central District, Eastern District, Western District, and Northern District Warehousing Corporation.

ELMER E. HALL for appellant Missouri District Warehousing Corporation.

NICHOLS, MORRILL, WOOD, MARX & GINTER for appellant Ohio District Warehousing Company.

R. J. NOWLIN for appellant Indiana District Warehousing Corporation.

J. T. BASKERVILLE for appellant Tennessee District Warehousing Corporation.

ELLIS A. YOST for appellant West Virginia District Warehousing Corporation.

J. M. DURBIN and THOS. D. SLATTERY for appellees.

OPINION OF THE COURT BY JUDGE LOGAN—Reversing.

On January 10, 1922 (Laws 1922, c. 1) the Bingham Co-operative Marketing Act was passed by the General Assembly of Kentucky and approved by the Governor. It was enacted largely as the result of the efforts of men interested in the improvement of the agricultural industry in the state. They were hunger fighters, as much so as Mark Carleton, who spent years in developing a kind of wheat which would withstand the hardships incident to our Western plains, or as Angus Mackay, who performed the same service for Canada in Saskatchewan,

Manitoba, and Alberta, or Marion Dorset, who eliminated hog cholera, or George Shull, who performed miracles in the development of corn, or George Hoffer, who disseminated knowledge which made it possible to make new soil out of old.

On the 11th day of January, 1922, a number of progressive farmers and business men interested in the tobacco industry organized the Burley Tobacco Growers' Co-operative Association. The business in which the association should engage was described in detail in its articles of incorporation. Its major purpose was to promote, foster, and encourage the business of marketing tobacco co-operatively, and in the carrying out of that business it was authorized to engage in any activity in connection with the grading, handling, processing, drying, storing, shipping, warehousing, manufacturing, and marketing of tobacco, or tobacco products of the association and of its members. It had full authority to finance all operations incident to its major purpose including the borrowing of money upon any commercial paper or negotiable instruments, warehousing receipts, mortgages or bonds, and to purchase, or otherwise acquire and hold, shares of the capital stock or bonds or securities of any corporation or association engaged in drying, grading, storing, shipping, handling, manufacturing, or marketing tobacco, or tobacco products. It also was given authority to buy, hold, lease, construct, contract for the use of, and exercise all privileges of ownership over, such real or personal property as might be necessary or convenient for the conduct and operation of any of the purposes of the association.

In addition to the specifically enumerated powers mentioned, there were other similar powers, and a clause conferring general powers upon the association expressed in the following language:

"And to do each and every thing necessary, suitable or proper, in the judgment of the directors of this association, anywhere throughout the world, for the accomplishment of any of the purposes or attainments of any one or more of the objects herein enumerated, or which shall at any time appear conducive to or expedient for the interest or benefit of the association and the members thereof and to contract accordingly."

The charter provides that the association shall make no profits for itself from any of its activities, but all of its operations shall be for the mutual benefit of its members only, and shall be co-operative in character. It also provides that the association shall not have any capital stock, but shall admit members into the association upon payment of an entrance fee of $5, and other uniform conditions.

The corporation (which is referred to herein as the association) prepared a uniform contract to be executed by the growers to the association, and through the execution of that contract the growers became members of the association. The signing up of memberships progressed until there were 108,000 members under contract covering a period of five years. The tobacco crops handled were those from 1921 to 1926, inclusive. Paragraph 16 of the grower's contract gave specific authorization to the association to deliver to any warehousing or other corporation organized for co-operation with the association any or all of the grower's tobacco for handling, processing, or manufacturing, or storing, and to charge against the tobacco and his prorated share of the funds necessary to create a reserve, equivalent to one class of its preferred stock annually plus bonus, to retire the said class and to pay the dividends on all outstanding stock thereof. The grower was to be charged for such deductions only on account warehouses or plants within his district, or within his benefit, as determined conclusively by the association, and for such deductions the grower was to receive a proportionate interest in such corporation.

Under the authority vested in it by its charter, the association undertook to acquire warehouses and to divide the burley-growing territory, in which it operated, into districts. Under the directions and supervision of the association, warehousing corporations were organized in each of the districts, and were incorporated as nonprofit-sharing corporations. Their organization and control were completely under the supervision of the association. The properties belonging to the association were paid for out of deductions made by the association from the proceeds of the tobacco delivered by the growers. Under a plan well worked out, the growers, in this way, paid the obligations of the warehousing corporations, including interest and dividends, and for the amount which each grower paid he received common

stock in the corporation. When the property was fully paid for, the corporation had outstanding common stock in the hands of the growers, and the stockholders of the warehousing corporations and the association were identical, except as to transfers of interest made by a small percentage of the growers. The financing of the warehousing corporations was carried out pursuant to a cross-contract between the association and the separate warehousing corporations. The warehousing corporations are separate and independent of the association, as they are separate corporate entities, with power to act and control their own affairs within the limitations of the contract which they have made with the association.

There is no disagreement or controversy about the original financing of the warehousing corporations in accordance with the contracts made between them and the association. Nothing relating to that particular part of the contract is involved in this litigation.

During the period that the contract between the growers and the association was in effect, the association handled 987,721,145 pounds of tobacco for its members, which sold for the gross aggregate sum of $199,732,740. The proceeds of this tobacco have been distributed among the members of the association, except the sum of $1,917,255.87. This is the balance of what is known in this record as the 1 per cent. fund. The 1 per cent. fund, which was 1 per cent. of the total gross proceeds of the sales of tobacco, amounted to $1,997,327.40, but that sum was reduced, under the directions of the board of directors of the association, by the sum of $80,071.53, and no complaint is made about the expenditure of the last-mentioned sum. The controversy arises over the status of the 1 per cent. fund, and a brief explanation is necessary for a proper understanding of the controversy.

The properties acquired by the warehousing corporations were not sufficient to handle the crops delivered by the members to the association. Additional facilities were necessary for the use of the warehousing corporations. These corporations had no funds with which to acquire such facilities. They had no funds with which to acquire any of the facilities at any time, except as the funds were obtained through the issuance of securities, thereafter redeemed by the association, and the funds so realized had proven insufficient. These warehousing corporations were but instrumentalities of

the association, to be used by it in the furtherance of its general purposes. Additional facilities were acquired, for which bonds were issued. The bonds were redeemed by the association through the use of the 1 per cent. fund. In retiring securities of the warehousing corporations in the first place, the members of the association received, for their money so used, stock in the warehousing corporations, but in retiring the bonds issued to acquire additional facilities the members received nothing for their money, which had been deducted under the provision creating the 1 per cent. fund. The question before the court is whether the association, having employed the 1 per cent. fund for the redemption of bonds used in the purchase of facilities for the warehousing corporations, may cancel the charges made against the warehousing corporations by the association for the fund so used, or must the association reduce such indebtedness of the warehousing corporations to cash and distribute the cash pro rata among those entitled thereto?

The association has entered into a contract with each of the warehousing corporations, adjusting matters between it and each of such corporations. The contract provides for the cancellation of so much of the indebtedness of the warehousing corporations to the association as is represented by the expenditure of money from the 1 per cent. fund on behalf of the corporations. These contracts, it is true, were entered into subject to their being upheld by the courts. The object of the suits which were instituted was to prevent the cancellation of such indebtedness from the warehousing corporations to the association, and to compel the association to reduce such indebtedness to cash and distribute the proceeds among those entitled thereto.

The lower court was of the opinion that the 1 per cent. fund must be held by the association, and distributed among its members, or those entitled to the proceeds thereof. His judgment was that the entire fund was subject to distribution, less such sums as had been actually expended by the association for credits and other commercial purposes and not recovered by the association. The judgment also provided that the 1 per cent. fund was not a general fund or reserve of the association subject to the disposition of its directors for general corporate purposes. It was further held that the association made a proper use of the funds in acquiring

the additional facilities for the warehousing corporations, but when it was so used the amount so advanced became an indebtedness of the respective warehousing corporations to the association. The association was enjoined from the further use or handling of the 1 per cent. fund, except to proceed to the reacquirement thereof from the parties to whom advanced, and the distribution of such surplus as there might be in the respective yearly 1 per cent. deductions among the delivering members each year, or the assignees or legal holders of the certificates of such delivering members.

The correctness of the judgment of the lower court must be determined from a consideration of the provisions of section 6 of the marketing agreement which is as follows:

"6. The association agrees to resell such tobacco together with tobacco of like type, grade and quality delivered by other growers under similar contracts, at the best prices obtainable by it under market conditions, and to pay over the net amount received therefrom (less freight, insurance and interest), as payment in full to the grower and growers named in contracts similar thereto, according to the tobacco delivered by each of them, after deducting therefrom, within the discretion of the association, the costs of maintaining the association and of handling, grading and marketing such tobacco; and of creating funds for credits and other general commercial purposes (said funds not to exceed 1 per cent. of the gross resale price). The annual surplus from such deductions must be pro rated among the growers delivering tobacco in that year on the basis of deliveries."

This section allows deductions from the proceeds of the tobacco resold by the association for its members for two general purposes. The first purpose is the cost of maintaining the association, and of handling, grading, and marketing such tobacco, and the second purpose is the deduction for creating funds for credits and other commercial purposes. The purposes of this section of the marketing agreement are clearly expressed, and there should be no great difficulty in giving the language a practical meaning, keeping in view the general purposes for which the association was organized. The require-

ment is that the "annual surplus from such deductions must be pro rated among the growers delivering tobacco in that year on the basis of deliveries."

Two deductions are provided for; one for the operating costs, and the other for credits and commercial purposes, and the surplus from both deductions must be distributed among the growers delivering tobacco, based on the deliveries for the year, or years, in which the surplus arose. A surplus is that which is left of a fund after the use of a sufficiency to satisfy the purposes for which the fund was set apart. If the association deducted more for the costs of operation than was required to satisfy these costs, that which remained was a surplus subject to distribution. If the 1 per cent. deduction, or any deduction within that limit for credits and commercial purposes, should amount to a greater sum than the fund so used for the year, the remainder would constitute a surplus, subject to distribution in accordance with the terms of the contract. It is not contended that any surplus arose by reason of the deductions made to take care of the costs of operation. It seems to be contended that the entire 1 per cent. fund is a surplus, except such as has been expended and is not recoverable by the association. If the use of the fund in acquiring additional facilities for the warehousing corporations was a lawful using of that fund to the extent that it was used, and no one appears to dispute that it was a lawful one, then it must have been a use for credits, or commercial purposes. If it was used for credits, or commercial purposes, there could be no surplus until the amount so used for credits and commercial purposes had been deducted from the amount of the fund so received. If there was no remainder after making such deductions of that which had been so used, then there was no surplus for distribution.

If there was no surplus for distribution arising from the deductions for costs of operation, or from the deductions for creating funds for credits and other general commercial purposes, it follows, of course, that there was no surplus for distribution under the terms of the contract. This does not mean, however, that because the board of directors of the association bought and paid for the additional facilities charging the cost thereof to the warehousing corporations, the association may now cancel its debts against the warehousing corporations.

The effect of such a procedure would be to transfer assets of one corporate entity to the assets of other corporate entities without any satisfactory reason therefor. If the association had acquired the additional facilities in its own name with the money which it expended out of the 1 per cent. fund, the association would now own such facilities. On the other hand, if the association had expended this sum for operating cost, and for carrying out of the general purposes of the association, probably it would not have constituted a use for credits or other general commercial purposes.

Speculation as to these matters is of no value in determining the question confronting us. Our conclusion is that there was no surplus, and that no distribution under the provision of the contract can be compelled at this time. These debts against the warehousing corporations are valid obligations from these corporations to the association, and they may not be canceled by the association. The association may exercise its own judgment, as long as it is exercised honestly and free from fraud and inequities, as to when it will require warehousing corporations to discharge this indebtedness. As to whether the association may again use the fund when collected for credits or other general commercial purposes is unnecessary for us to determine at this time. Eventually, and at the discretion and judgment of the board of directors of the association, honestly exercised, free from fraud and inequities, this fund will be distributed among the members of the association and those having acquired rights from such members.

But it is urged that the association is inactive, and that no useful purpose would be served in allowing it to further retain control of this fund. The association has a large membership. It is admitted in the petition that those who once became members still remain so, except where death has intervened. It is true the contracts with the growers have expired. It is suggested, with plausibility, that it may be of the utmost importance to the members of the association to maintain, as it were, the status quo of the warehousing corporations and the association. It may be that the members of the association will find it to their best interest to again conduct their affairs through the instrumentalities of the association and the warehousing corporations. Many million dollars have been expended in perfecting the organization which

now exists, and in acquiring the properties now held by the association and the warehousing corporations. It appears to us that the question of whether the organization should be held in readiness, awaiting developments in the future, is one which addresses itself to the sound discretion of the board of directors of the association. The association is not dead, and it may be re-energized without delay, and without going through the cumbersome proceedings of starting anew, if the necessity therefor should arise. The fact that it is ready to again take up and pursue the purposes for which it was organized may be of itself of great value to the members. We have disposed of the question sufficiently to make clear the law governing the questions before us. The contracts proposed between the association on one side, and the warehousing corporations on the other, may not be carried out, in so far as they provide for a cancellation of the indebtedness arising from the advancement of money from the 1 per cent. fund. The association cannot be compelled, under the showing made by this record, to collect these debts at this time from the warehousing corporations and make distribution thereof.

Judgment reversed, and cause remanded for proceedings consistent with this opinion.

Whole court sitting.