### Burley Tobacco Growers' Co-operative Association et al. v. Brown.

(Decided May 28, 1929.)

ROBERT H. HAYS, AARON SAPIRO and J. A. DONALDSON & SONS for appellants.

FRANK S. CONNELLY and JOHN L. VEST for appellee.

OPINION OF THE COURT BY JUDGE LOGAN—Reversing:

The facts involved in this case are almost the same facts as in Burley Tobacco Growers' Co-operative Association v. Robert E. Tipton et al., 227 Ky. 297, 11 S. W. (2d) 119. We deem it unnecessary to restate the elemental facts. That case involved agreements between the Burley Tobacco Growers' Association and the warehousing corporations, operated for, and under the control of, the association, wherein the parties attempted to cancel the obligations of the warehousing corporations to repay to the association the money spent for them which was taken out of the 1 per cent. fund by the association for credit and commercial purposes. In that case it was decided that two general deductions were provided in paragraph 6 of the standard marketing contract, one for operating costs and the other for credits and commercial purposes; that any surplus arising from either deduction must be distributed among the growers delivering tobacco, based on the deliveries for the year, or years, in which the surplus arose; that the use of the 1 per cent. fund in acquiring additional facilities for the warehousing corporations was allowable by the terms of the standard marketing contract, and that, as the entire fund had been used each year for credits and commercial purposes, no surplus arose from the deduction which had been made; that there had been no surplus in the 1 per cent. fund at the end of any year, and for that reason no distribution could be compelled at the end of each year because, the entire fund having been legally used, there was nothing to distribute; that the association could not be forced, at the time of the decision, to collect from the warehousing corporations the money advanced for their use out of the 1 per cent. fund; that the association should exercise its own judgment, as long as it exercised it honestly and free from fraud or irregularities, as to when or how the warehousing corporations would be required to pay or adjust their indebtedness; that the question of whether the association should be held in readi-

ness for future marketing activities was one that addressed itself to the sound discretion of the board of directors of the association.

The opinion in the Tipton case did not determine whether the 1 per cent. fund should be treated as a corporate asset, or as a trust fund, but did determine that the fund used as it had been used by the association was a use for credits or commercial purposes, and therefore legal. It was not decided whether the association had authority to collect the fund from the warehousing corporations and again use it for credits or commercial purposes. But the opinion did hold that the association should, in the discretion of its directors, collect the indebtedness due by the warehousing corporations to the association, and that eventually the fund should be distributed among those entitled thereto as provided in the standard marketing contract. The opinion did not deal with the indebtedness of the warehousing corporations to the association further than was necessary to determine that the indebtedness could not be canceled. The opinion did not deal at all with any indebtedness, admitted or claimed, of the association to the warehousing corporations, as these claims were not involved in that litigation further than as above indicated.

It appeared in the Tipton Case that the warehousing corporations were making claims against the association. and it also appeared that there had been an effort to adjust the claims between the association and the warehousing corporations.

After the decision in the Tipton Case the association and the warehousing corporations sought to adjust the claimed indebtedness, one against the other. As was pointed out in the Tipton Case the stockholders in the warehousing corporations were almost, if not wholly, identical with the members of the association. Litigation between the association on the one side and the warehousing corporation on the other would be in effect, the members of the association litigating with themselves as stockholders of the warehousing corporations, although it is made to appear in the record that a small percentage of the tobacco grower members of the association had parted with their stock without parting with their interest in the one per cent. fund. In view of the close business relationship between the association and the warehousing corporations, which was so close as to

be almost identical, the board of directors of the Burley Tobacco Growers' Co-operative Association passed a resolution enumerating conditions and circumstances surrounding all transaction between the association and the warehousing corporations. The first resolution stated concisely the intention and purposes of the association as they related to the future. A second resolution was passed in which the association recognized its liability in a financial way to the warehousing corporations, and it was admitted in that resolution that the liabilities of the association to the warehousing corporations arose out of the contracts between the association on one side and the separate warehousing corporations on the other. The resolution recited that the warehousing corporations were also indebted to it in certain sum by reason of money which had been advanced out of the 1 per cent. fund for the use of the corporations. A desire to settle all claims with the corporations was expressed in the resolution, and it was suggested to the corporations that the adjustment be made through arbitration, and that the judgment of the arbitrator should be final, conclusive, and binding upon the association and all of the parties to the arbitration. The resolution requested Hon. Robert W. Bingham to act as arbitrator and nominated him as an arbitrator which would be entirely satisfactory to it, and the resolution expressed the reasons for the suggestion that judge Bingham be selected as arbitrator as being on account of his outstanding eminence, and because he had been interested in all of the developments of the association as a director elected by the board for the purpose of representing the entire public of the state of Kentucky, including growers of tobacco, persons interested in warehousing, and all others who had come into any contact with the association, and, further, because he had no interest in any claims of the association or the corporations, and for the further reason that he understood fully all the complicated issues between the association and the corporations.

Each of the warehousing corporations adopted a resolution through their respective boards of directors consenting to the suggestion of the association that the claims be arbitrated, and agreeing that Judge Bingham should act as the arbitrator. Thereupon an arbitration agreement was prepared and executed as is provided by

the statutes of the state. In March, 1929, Judge Bingham held hearings when all of the parties of the arbitration were represented. Claims were presented by the association and counterclaims were submitted by the corporations. Proof was heard, documentary and oral, and from a consideration of all the facts, evidence, and deducible inferences, the arbitrator made a decision.

The association presented claims against the Northern District Warehousing Corporation, amounting to $282,675.79. An itemized statement filed with the record contains full information as to these claims. The Northern District Warehousing Corporation presented claims against the association, aggregating $857,231.64. Each item in this claim was supported by an exhibit explaining the basis of the claim. The claims were based upon a failure on the part of the association to maintain the properties of the corporation; for depreciation; for loss of equipment; for storage of tobacco; for redrying tobacco; for money paid Security Trust Company, trustee; for obsolescene; and for erroneous charges made by the association against the corporation due to failure of the association to properly operate properties.

The corporation admitted the claim of the association and the association admitted its liability on the claim of the corporation to the extent of some of the items, but controverted its liability on other items. The arbitrator rendered an award as follows:

"Upon consideration of all the foregoing evidence, both documentary and oral, I find that the Northern District Warehousing Corporation is obligated and indeted to the Burley Tobacco Growers' Co-operative Association for credits advanced to it to enable it to acquire, equip, maintain, and operate properties for warehousing and other purposes necessary to the performance by the association of its functions in the co-operative marketing of burley tobacco; and I find that all the operations of the corporation were under the complete control of the association and that the association had the power and the opportunity to enable the said corporation to secure profitable returns from its properties; and I find that, out of the activities and operations of the said properties by the association, the association has become obligated to the said corporation;

the association is obligated and indebted to the corporation for failure to give adequate credit for depreciation, storage of tobacco, losses of equipment, and profitable use of properties, and I find that all of these obligations have arisen out of the very operations and activities for which the original funds and credits were provided by the association to the corporation and that such obligation and indebtedness to the corporation from the association constitute a counterclaim against the obligation for funds and credits incurred thereunder; and I find that the obligation of the corporation to the association is less than the obligation of the association to the corporation; and I therefore award to the Northern District Warehousing Corporation the sum of $19,000, to be paid to the said corporation by the Burley Tobacco Growers' Co-operative Association on or before March 31, 1929, or at such other date as the parties may agree, with interest from March 31, 1929, only at 6 per cent. per annum, as a net award over and above the satisfaction by this award of all other claims and obligations between the said association and said corporation including expressly the obligation on any and all outstanding bonds.''

This finding is clear and explicit. The arbitrator found that the claims against the association for failure to give adequate credit; for depreciation; for storage of tobacco; for losses of equipment; and for failure to allow a profitable use of the properties were valid obligations, and the amount of the allowance exceeded the indebtedness of the corporation to the association by $19,000. This award of the arbitrator was approved and accepted by the association, and also by the Northern District Warehousing Corporation. The purpose of the arbitration was to fully adjust and settle all financial liabilities of the one to the other.

The appellee, Robert B. Brown, is a stockholder in the Northern District Warehousing Corporation, and a member of the Burley Tobacco Growers' Co-operative Association. Conceiving that the association was without power to enter into the arbitration agreement, or to comply with the terms of the award, he instituted this suit in the Gallatin circuit court. He asked, and was allowed, to sue and conduct the action in his name for the benefit of all members of

the Burley Tobacco Growers' Co-operative Association, their assignees, lienees, and personal representatives; he prayed that the court make a declaration of rights as to the rights and interest of the parties to the suit; as to the powers and rights of the boards of directors of the association and the warehousing corporation to enter into the arbitration agreement and to carry into execution the award of the arbitrator; and that the association and the warehousing corporation be enjoined and restrained from carrying into execution the award. The chancellor below enjoined the association and the corporation from carrying into execution the award of the arbitrator, and this appeal resulted.

There is no claim of fraud or mistake, and no objection was made to the admission or exclusion of any testimony by the arbitrator, or to any of his rulings. The sole objection to the arbitration proceedings is found in the petition, and is to the effect that the association was without power to enter into the arbitration agreement, and, if the award should be carried into effect, it would result in the wasting and loss of the corporate assets of the association to the damage and loss of appellee as a member of the association, and the loss of his equities in its assets; that the funds created by the deduction of 1 per cent. of the gross resale of the tobacco delivered by plaintiff, and all other members, would be depleted thereby to the extent of the award: that the arbitration agreement was entered into improperly; and that it was in fraud of the rights of appellee and all other members of the association. The allegations in the petition and the contention of counsel for appellee are that the association should have collected the indebtedness due by the warehousing corporation and should then have distributed the proceeds as is provided by the terms of the contract for the distribution of surplus arising from the two deductions mentioned in the beginning of this opinion and dealt with in the Tipton case.

It is first contended by counsel for appellee that paragraph 6 of the standard marketing contract provides for two types of deductions, one for operating costs and the other for credits and commercial purposes. The latter is what is known as the 1 per cent. fund. It is contended that the counterclaim of the corporation is based on operating costs, and that such costs should have been paid out of the deduction made for that purpose,

and that the deduction for credits and commercial purposes could not be used for operating costs. We do not agree with this contention. It is true that a deduction was provided to take care of operating costs; but, if that deduction was not sufficient for the purpose, and any of the costs of operation may be classified under the head of "credits," or "commercial purposes," it follows that the 1 per cent. fund could be used for such operating costs.

It is contended that the claims of the association against the warehousing corporation arose out of the 1 per cent. fund; that is, out of the fund provided for credits and general commercial purposes. No one disputes that fact. The court so held in the Tipton case, and it is admitted by all parties to this litigation. But this court did not decide in the Tipton case whether the 1 per cent. fund which had been once used might be used again, after it was collected, for credits and general commercial purposes. As the fund was created for the specific purpose of "credits" and "general commercial purposes," it is our conclusion that the board of directors may so use it as long as, in their judgment, it is for the best interest of the association that it be so used. If the claims by the warehousing corporation against the association are such claims as grow out of general commercial transactions, and they are paid by the association, it could not be well argued that in paying the claims out of the 1 per cent. fund the use was not for general commercial purposes.

Another ground urged against the arbitration is that the claims of the association against the corporation grew out of one deduction provided for in the contract, while the claims asserted by the corporation against the association arose, if at all, from another deduction. We see no reason why the 1 per cent. fund, under the authority conferred by the contract, may not be used to settle an indebtedness arising out of a violation of that contract. If the 1 per cent. fund is used by the association within the terms of the contract—that is, for "credits," or "general commercial purposes"—no legal objection can be made by any one to its use. The term "general commercial purposes" is broad, and it is broad enough to embrace any purpose in furtherance of the commercial activities of the association, and the commercial activities of the association will be furthered by its paying an indebtedness which it admits that it owes.

The main contention made by appellee is that the 1 per cent, fund is a trust fund, and that the entire fund, in so far as is possible, should be assembled and distributed in accordance with the provisions of the contract relating to the distribution of a surplus. If it were a surplus this contention would have much weight; but this court found that there was no surplus, and therefore the provision in the contract for a compulsory distribution cannot be invoked by members of the association. Reducing the contention of appellee to its last analysis, it amounts to no more than that the 1 per cent. fund was a trust fund, and that, when it was invested in the bonds of the warehousing corporations, it remained a trust fund, and that this fund cannot be used for the payment of the obligations of the association unless these obligations arose directly in connection with the 1 per cent. fund itself. This contruction of the contract is entirely too narrow, as was pointed out in the Tipton Case.

Counsel for appellee find much difficulty in understanding the court's opinion in the Tipton case. We do not find the same difficulties. The Tipton case decided that the fund arising through the 1 per cent. deduction was a fund which could be used by the association under the terms of the contract for credits and general commercial purposes, and that the use which had been made of the fund was in accordance with the purposes for which it was created. The opinion went further and held that eventually the association would have to distribute the fund in accordance with the terms of the contract. That is entirely true, provided that there is a fund for distribution when the association has finished using it for "credits" and "general commercial purposes." The association is not a corporation for profit, and whatever is left of the 1 per cent. fund, after the association has used it for the purposes mentioned in the contract, will be distributed among the members of Burley Tobacco Association and such as may have an interest in the particular fund. But this does not mean that the board of directors, in the exercise of a sound judgment, may not use the fund as provided in the contract as long as the use may be necessary. It may be that it would be improper to call the fund a general corporate asset, and it may be that it would be improper to call it a trust fund, but it is a corporate asset which may be used for the specific purposes mentioned in the contract, and it par-

takes of the nature of a trust fund in that any balance unexpended for the purposes mentioned in the contract will be distributed at some time, either when the association so directs, or when its existence is at an end.

Much reliance is placed by counsel for appellee on this language in the opinion in the Tipton case: "On the other hand, if the association had expended this sum for operating cost, and for the carrying out of the general purposes of the association, probably it would not have constituted a use for credits or other general commercial purposes."

It is true that statement is found in the opinion in the Tipton case, but the court did not hold that such a use would not constitute a use for credits or other general commercial purposes. The court did not commit itself to that particular enunciation of the law, but expressed the opinion that "probably" that would be a proper construction of the contract. Looking at it now, we are inclined to the opinion that the words, "or other general commercial purposes," should have been left out of that sentence when the opinion was written before. The opinion in the Tipton case is not the law of this case, as this is a different case involving different issues on a different state of facts.

Another point which is adverted to in the brief for appellee is that the corporation had executed a mortgage to the association in satisfaction of the indebtedness claimed by the association. The brief for appellee frankly admits that the allegations in the counterclaim of the corporation that it had no knowledge or information concerning the accounts between it and the association at the time this mortgage was executed are true. This is true, so it is admitted in the brief, because the officers of the warehousing corporation did substantially everything as was directed by the association itself It is also admitted in the brief that the mortgage executed to the association by the corporation was executed without consideration and by mutual mistake if the claims of the corporation against the association are such as may be offset against the corporation. There seems to have been a controversy between the association and the corporation over the execution of the mortgage. The corporation claimed that the true state of facts had not been disclosed to it at the time it executed the mortgage. Admittedly it was owing the debt that the mortgage was executed to secure,

but it has been suggested that the execution of the mortgage is convincing proof that it was making no claim against the association at the time. In response to that suggestion, it alleged that it did not know all of the facts at the time the mortgage was executed. The controversy was one of the matters covered by the arbitration agreement.

Our conclusion is that the arbitration agreement and the award made thereunder are in all respects legal, and that they are binding on the association and its members, and the warehousing corporation and its stockholders. The lower court having reached a different conclusion renders a reversal of the case necessary.

Judgment reversed, and cause remanded for proceedings consistent with this opinion.

Whole court sitting.